IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

EDDIE WILLIAMS,

              Plaintiff,

     v.

GEORGE HAYMAN, et al.,

            Defendants.

HON. JEROME B. SIMANDLE

Civil Action No. 06-3705

**OPINION**

APPEARANCES:

John M. Armstrong, Esq.
SCHNADER, HARRISON, SEGAL & LEWIS
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1165
    Attorney for Plaintiff Eddie Williams

Sarah Brie Campbell, Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY
DEPARTMENT OF LAW & PUBLIC SAFETY
R.J. Hughes Justice Complex
P.O. Box 112
Trenton, NJ 08625
    Attorney for Defendants

**SIMANDLE**, District Judge:

## I.    INTRODUCTION

Plaintiff filed the Complaint in this action while he was incarcerated at South Woods State Prison ("SWSP"), alleging that he was denied access to various programs and services at SWSP because he is deaf, which, he argues, violates Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 et seq.  The defendants herein are George W. Hayman, Commissioner of the New Jersey Department of Corrections; Joseph D'Amico,

Executive Director of the New Jersey Parole Board; Katherine MacFarland, Chief Administrator of SWSP; Amadou Jalloh, Assist Administrator of SWSP; Linda Everett, Parole Administrator of SWSP; Officer Prianccini; Linda Solanik, a social worker at SWSP; Cheryl Bard, a social worker at SWSP; and Dr. Banks, a psychiatrist at SWSP.  Defendants have moved (1) to dismiss the complaint because Plaintiff allegedly failed to exhaust his administrative remedies as is required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), and (2) for summary judgment on the grounds that Plaintiff was provided access to the programs and services in question, that the individual defendants are entitled to qualified immunity, and that Plaintiff is entitled neither to punitive nor compensatory damages.  (Docket Item 27.)

The principal issues to be decided involve (1) whether a deaf inmate who has demonstrated himself to be incapable of clear written communication must nonetheless comply with the requirement of submitting a written administrative remedy form and exhausting the written administrative appeal process in order to comply with the PLRA's prerequisite to the inmate's filing of suit, and (2) whether individual governmental employees may be held liable under Title II of the ADA.  The Court will also examine whether Plaintiff's evidence creates a genuine dispute of material fact whether Plaintiff's ADA rights have been violated

2

by being precluded from participating in available prison programs on account of his hearing disability.

For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion as follows: (1) the Court will grant the Individual Defendants' motion and dismiss them from this case; (2) Defendants' motion to dismiss Plaintiff's claim for punitive damages will be granted; and (3) the remainder of the relief sought in Defendants' motion will be denied.

## II.   BACKGROUND

### A.   The Alleged Denial of Services and Plaintiff's Complaint

The plaintiff, Eddie Williams, is a thirty-seven-year-old deaf man.  (Brooks Aff. Ex. A 1; Villar Aff. Ex. B 3.)  On November 13, 2005, Mr. Williams was sentenced to a three-year term of imprisonment for aggravated assault and was transferred to the custody of the New Jersey Department of Corrections ("NJDOC").  (Brooks Aff. Ex. A 1.)  Mr. Williams was transferred to SWSP on December 13, 2005.  (Id. at 5.)  The day after Mr. Williams was transferred to SWSP, December 14, 2005, he completed an NJDOC form entitled "Request for Deaf and Hard of Hearing Inmates," on which he answered affirmatively to the question, "Will a sign language interpreter help us communicate effectively with you?"  (Villar Aff. Ex. C.)  Mr. Williams also indicated on the form that he wanted a "Telecommunication Device

3

for the Deaf TDD/TTY with Light Signaler" and television captioning.  (Id.)  Mr. Williams signed the form, as did Defendant Cheryl Bard, an NJDOC social worker.  (Id.)

On June 28, 2006, Mr. Williams wrote a letter to New Jersey Governor Jon Corzine complaining of his inability to participate in certain programs at SWSP on account of his disability.[1]  (Dill Aff. Ex. A 1.)  Mr. Williams' letter was referred to Karen Willoughby, Director of the Division of Operations at NJDOC, who wrote Mr. Williams a letter dated July 19, 2006 in which she informed him that "[i]nmates with hearing impairments are not precluded from" participating in the inmate programs offered at SWSP.  (Id.)  Ms. Willoughby's letter also made note of the fact that Mr. Williams had not yet participated in any such programs and that "the State Parole Board will look favorably upon your program participation when determining your suitability for parole release."  (Id.)

Mr. Williams responded to Ms. Willoughby's letter in a letter dated July 28, 2006, in which he complained that he had been denied access to "a number of services due to [his] hearing impairment."[2]  (Id. at 2.)  Mr. Williams clarified that he had

---

[1]  Neither party submitted to the Court a copy of Mr. Williams' June 28, 2006 letter, and so the precise details of Mr. Williams' complaint are not clear from the record.

[2]  It is apparent to the Court that Mr. Williams received some assistance in preparing the letters he sent to Ms. Willoughby.  Mr. Williams' written communications to the Court

"continually requested programs" but that his requests had been ignored because SWSP could not afford to hire an interpreter, and that the social worker who conducted the behavior modification program was not an official interpreter. (Id. at 2-3.) Finally, Mr. Williams informed Ms. Willoughby that there were no "TTY phone systems" on his tier, noting that the other inmates had access to telephones "at any time."[3] (Id. at 3.)

Ms. Willoughby responded in an August 15, 2006 letter, in which she stated that it was her understanding that social worker Cheryl Bard conducted Mr. Williams' behavior modification program and that Ms. Bard could communicate effectively with Mr. Williams with sign language. (Id. at 8.) With regard to Mr. Williams' complaint about access to the TTY system, Ms. Willoughby advised Mr. Williams that he could use the system between 8:45 a.m. and 10:30 a.m. and between 1:00 p.m. and 2:00 p.m. on weekdays and noted that Mr. Williams had used the system twelve times in a

---

indicate that his ability to communicate in writing is very limited, (see, e.g., Pl.'s Opp'n Br. Ex. D), whereas his letters to Ms. Willoughby are clear and intelligible. As Mr. Williams testifies in his affidavit, he has "great difficulty with communicating, even in writing" and "often leave[s] out important words that are commonly used by other people when writing or speaking." (Williams Aff. ¶¶ 21-22.)

[3] A TTY, which stands for "telephone typewriter," is "an electronic device for text communication via a telephone line, used when one or more of the parties has hearing or speech difficulties." Wikipedia, Telecommunications Device for the Deaf, http://en.wikipedia.org/wiki/Telecommunications_devices_ for_the_deaf (last visited June 2, 2008).

two-month period.  (Id.)  Finally, Ms. Willoughby stated that Mr. Williams was to utilize SWSP's Inmate Remedy Form rather than corresponding directly with the NJDOC to address his concerns about access to SWSP programming and education.  (Id.)

On August 16, 2006, Mr. Williams filed the instant Complaint [Docket Item 1].  The Complaint alleges that Mr. Williams sought to participate in "a multitude of social and educational programs (A/A, N/A, Behavior Modification) which all were denied because the social worker advised him [that] the prison would not and/or will not hire an interpreter because it was too expensive."  (Id. at 5.)  In the section of the civil rights complaint form directing the plaintiff to explain whether he has "sought informal or formal relief from the appropriate administrative officials regarding the acts complained of," Mr. Williams wrote the phrases "Institutional Remedy" and "Complaints Department of Corrections."  (Id. at 3.)

On August 24, 2006, Mr. Williams submitted an Inmate Remedy Form to SWSP.  His complaint form reads in its entirety: "Ms barb conducts a Behavior Modification Program with me And she is capable of communicationing efficiently with use of sign language I have to telling you that true but Ms barb have not certified of interpreter." (Villar Aff. Ex. B 7.)  On August 28, 2006, Mr. Williams received a written response to the complaint on his Inmate Remedy Form, which read in full: "You are correct – Ms.

6

Bard is not a Certified Interpreter.  Behavior Modification is not a judicial or quasi-judicial proceeding that requires the use of a certified interpreter."  (Id.)

After this action was commenced, Plaintiff deposed Ms. Bard about her ability to communicate with Plaintiff through sign language.  At her deposition, Ms. Bard testified that before she endeavored to learn sign language, no one employed by the prison knew sign language; she stated that she "became curious [about sign language] because there was nobody here to help [hearing-disabled inmates]."  (Bard Dep. 10.)  Ms. Bard further testified that she took a sign language course and had a book on the subject, but was primarily "self-taught."  (Id.)  She indicated that her sign language vocabulary was limited, that she communicated with deaf inmates "the best that [she] could," and that she resorted to "finger spell[ing]" or communicating in writing when her sign language abilities proved insufficient. (Id. at 36-37.)  Despite these apparent limitations, Ms. Bard testified that she was not aware of any occasions when Plaintiff did not appear to understand what she was trying to tell him, since they "would work it back and forth until [they] got to what he wanted."  (Id. at 20.)

**B.    SWSP Policies**

1.    <u>Access to SWSP Programs for Hearing-Disabled Inmates</u>

In their submissions, Defendants have highlighted various SWSP policies that are relevant to this litigation.  First, Defendants state that as a general matter, SWSP provides access to programs and services for hearing-disabled inmates.  (Villar Aff. ¶ 9.)  At three locations in the prison – the intake area, the court line, and the medical area – signs with the following text are posted:

> Notice to Deaf & Hard of Hearing – You have the right to a sign language interpreter if one is required for you to effectively communicate with Corrections staff. If you are deaf or hard of hearing and require a sign language interpreter to communicate, please let us know.

(<u>Id.</u> at ¶ 10.)  Copies of this notice are also provided to each inmate.  (<u>Id.</u>)  According to Defendants, SWSP staff communicate with hearing-impaired inmates using the inmate's preferred method of communication, including sign language, whenever possible.  (<u>Id.</u> at ¶ 12.)  If an inmate's preferred method of communication is sign language, then a "Certified Interpreter" is used to communicate with the inmate during all judicial and quasi-judicial proceedings, including parole, classification, and disciplinary proceedings.[4]  (<u>Id.</u> at ¶ 13.)  SWSP does not use

---

[4]  At Plaintiff's initial classification hearing on December 20, 2005, and at his parole hearing on February 17, 2006, a certified interpreter was present.  (Villar Aff. Ex. D, E.)

certified interpreters to communicate with deaf inmates in other contexts, but instead uses "qualified" (but not certified) interpreters. (Id.) According to Defendants, Ms. Bard, a SWSP social worker, is a qualified sign language interpreter. (Dill Aff. Ex. A 5.)

    2.   Administrative Remedy Program at SWSP

    Defendants also submitted evidence pertaining to SWSP's Inmate Grievance and Tracking Program (the "Grievance Program"). The Grievance Program is an administrative mechanism at SWSP "designed to provide a direct and confidential route for inmates to make the Administration aware of their problems and concerns [and to] allow the Administration to effect timely and appropriate responses to these problems and concerns." (Villar Aff. Ex. A.) Although the SWSP Inmate Handbook describes the Grievance Program as a four-step process, Defendants indicate that three of the four steps apply only to parole-related requests and are not applicable to Mr. Williams' case. (Id.; Villar Aff. ¶ 6.) For complaints not related to parole, the Grievance Program requires inmates to complete an Administrative Remedy Form and place the form in one of the prison's drop boxes. (Villar Aff. Ex. A.) The Inmate Handbook instructs inmates that their "[w]riting must be legible and the problem/concern specific to the issue." (Id.) Additionally, inmates are instructed that "[t]he inmate submitting the form is the only person who may

9

prepare the form.  The unit Social Worker may assist if necessary."  (Id.)  Once the inmate has received a response to his Administrative Remedy Form, "his administrative remedies have been exhausted."  (Villar Aff. ¶ 6.)

### C.  Procedural History

Plaintiff, who was proceeding pro se when this action commenced, filed his Complaint on August 8, 2006.  (Docket Item 1.)  On August 31, 2006, Plaintiff filed a motion for the appointment of pro bono counsel, (Docket Item 4), which the Magistrate Judge denied as premature on September 8, 2006.  (Docket Item 5.)  Defendants subsequently moved to dismiss and/or for summary judgment.  (Docket Item 27.)

In its June 11, 2007 Opinion and Order, the Court found "that the interests of justice require the appointment of counsel to assist Mr. Williams in the prosecution of this case."  (Docket Item 33 at 5.)  Specifically, the Court noted that

> Plaintiff has a limited ability to present his case on his own; the legal issues are quite complex; factual investigation will be necessary; Plaintiff's ability to pursue such investigation is impaired by his continued incarceration and limited resources; and Plaintiff cannot afford counsel on his own behalf.

(Id. at 7.)  The Court accordingly ordered the appointment of pro bono counsel to represent Plaintiff and denied Defendants' motion to dismiss without prejudice to reinstatement following the appointment of counsel.  (Id. at 7-8.)  Defendants' motion was reinstated on November 7, 2007.  (Docket Item 43.)

10

On January 4, 2008, the Court convened a hearing to hear oral argument on Defendants' motion to dismiss and/or for summary judgment.  At the request of Plaintiff's counsel, the Court permitted Plaintiff to conduct limited discovery related to Defendants' motion, authorizing Plaintiff to depose Ms. Bard, the SWSP social worker who Plaintiff claimed could not communicate with him effectively in sign language.  The parties also submitted supplemental briefs addressing the information gleaned from this limited round of discovery.

## III. DISCUSSION

### A.   Standard of Review

The Court first addresses the standard of review that governs its analysis of Defendants' motion.  Defendants have moved for dismissal pursuant to F. R. Civ. P. 12(b)(6) and/or for summary judgment pursuant to F. R. Civ. P. 56.  Because Defendants go "beyond the face of the pleadings" in their motion, the Court will treat Defendants' submission as a motion for summary judgment.[5]  See Robinson v. Dalton, 107 F.3d 1018, 1022 (3d Cir. 1997).

_____

[5] While the Court treats Defendants' motion as one for summary judgment, it agrees with Plaintiff that not all issues raised in Defendants' submissions are ripe for decision under this standard, since the parties have, to date, conducted very limited discovery.  In particular, as the Court explains, infra, Defendants' motion for summary judgment as to Plaintiff's claim for compensatory damages will be denied as premature in light of Plaintiff's stated intention to conduct discovery on this matter.

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255). It there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment may not be granted. Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

12

**B.    Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's Complaint should be dismissed on account of the fact that Plaintiff failed to exhaust his administrative remedies, which the Prison Litigation Reform Act ("PLRA") requires inmates to complete before they seek to resolve their concerns through litigation.  Defendants note that in this Circuit, the PLRA's exhaustion requirements compel prisoners to comply with grievance procedures set out in inmate handbooks, even if the procedures are not formally adopted by the state administrative agency.  See Concepcion v. Morton, 306 F.3d 1347, 1348-49 (3d Cir. 2002).  Accordingly, they argue, the Grievance Program set out in the SWSP's Inmate Handbook is an administrative remedy within the meaning of 42 U.S.C. § 1997e(a) which an inmate must exhaust prior to pursuing his claims in court.

In this case, Defendants argue, Plaintiff did not file an Administrative Remedy Form to address his inability to access prison programs and services prior to August 16, 2006, when he filed his Complaint to commence this litigation.[6]  Plaintiff did file an Administrative Remedy Form on August 24, 2006, after he filed suit in this case, but, according to Defendants, the

---

[6]  As Defendants note, Plaintiff did in the past file several Administrative Remedy Forms to address different issues, which, they assert, indicates that he was aware of the Grievance Program.

13

complaint form is merely directed at the fact that Ms. Bard is not a certified interpreter, and indeed Plaintiff states on the form that Ms. Bard interprets "efficiently."   (Villar Aff. Ex. B 7.)

Defendants further argue that Plaintiff's letters to Ms. Willoughby are insufficient to satisfy the PLRA's exhaustion requirements because, as the Supreme Court recently held, 42 U.S.C. § 1997e(a) requires "proper exhaustion."  Woodford v. Ngo, 126 S.Ct. 2378, 2387 (2006) (noting that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without some orderly structure on the course of its proceedings").  Mr. Williams was not permitted to invent his own grievance procedure to sidestep the requirements of section 1997e(a), according to Defendants, because exhaustion under the PLRA is required even if the inmate believes that utilizing the internal grievance process would be "futile."  Booth v. Churner, 532 U.S. 731, 741 n.6 (2001).  In short, Defendants argue, Mr. Williams "denied the Defendants the opportunity to review, address and resolve the issues raised in his Complaint at the institutional level before bringing this litigation," which requires that his Complaint be dismissed.  (Def.'s Br. 15.)

The Court will deny Defendants' motion to dismiss on account of Plaintiff's failure to exhaust administrative remedies.  The PLRA provides in relevant part that

> [n]o action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  The PLRA's exhaustion requirement applies to all inmate suits "about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).  Furthermore, as Defendants correctly note, exhaustion of all administrative remedies is mandatory whether or not the inmate believes that such administrative remedies would be effective and even if the available administrative processes cannot grant the desired remedy.  Booth, 532 U.S. at 739-41.  Enforcement of the PLRA's exhaustion requirement serves the twin goals of "protect[ing] administrative agency authority . . . . [and] promot[ing] efficiency." Ngo, 126 S.Ct. at 2385.  The PLRA's exhaustion requirement furthers these goals by providing the "prisoner who does not want to participate in the prison grievance system" with the "incentive to comply with the system's procedural rules." Id. at 2388.

In order for the exhaustion requirement to apply, however, the administrative remedies in question must actually have been

"available" for the inmate to exhaust.  § 1997e(a).  In Brown v.
Croak, 312 F.3d 109, 112 (3d Cir. 2002), for example, the Court
of Appeals found that where the plaintiff alleged that prison
guards directed him not to follow the formal grievance process,
there was a material issue of fact as to "whether these
instructions rendered the formal grievance procedure unavailable
to him within the meaning of 42 U.S.C. § 1997e."  Id. (citing
Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001), for the
proposition that "a remedy that prison officials prevent a
prisoner from 'utilizing' is not an 'available' remedy under §
1997e").

As in Croak, there are unresolved factual questions in this
case regarding whether the administrative remedies proffered by
Defendants were "available" to Mr. Williams under section 1997e,
making the entry of summary judgment for Mr. Williams' failure to
exhaust such remedies inappropriate at this time.  The Grievance
Program at SWSP requires that an inmate complete an
Administrative Remedy Form in a manner that clearly specifies the
"problem/concern specific to the issue" that the inmate seeks to
resolve.  (Villar Aff. Ex. A.)  Whether Mr. Williams' disability
inhibited his capacity to express his grievances comprehensibly
in writing in accordance with the Grievance Program's
requirements is a triable issue of fact in this case.  Cf. Days
v. Johnson, 322 F.3d 863, 868 (5th Cir. 2003) (holding that

16

administrative remedies were not "available" to an inmate whose
medical condition prevented him from complying with prison
grievance system requirements).  Mr. Williams testified that he
has "great difficulty with communicating, even in writing" and
"often leave[s] out important words that are commonly used by
other people when writing . . . "  (Williams Aff. ¶¶ 21-22.)  One
of Mr. Williams' attorneys has likewise testified that she has
"had great difficulty getting Mr. Williams to intelligibly
respond in writing."  (Overton Cert. ¶ 7.)  The evidence of Mr.
Williams' writing in the record corroborates this testimony
regarding the serious limitations on his ability to communicate
in writing.  (Villar Aff. Ex. B 7.)

     The Inmate Handbook expressly forbids inmates from
soliciting assistance in preparing Administrative Remedy Forms,
further suggesting that the Grievance Program was not an
"available" remedy for Mr. Williams.  Specifically, the Handbook
instructs inmates that the "inmate submitting the form is the
only person who may prepare the form."  (Villar Aff. Ex. A.)  It
is true that the Handbook permits inmates to request the
assistance of the unit social worker in the preparation of
Administrative Remedy Forms "if necessary."  (Id.)  However, the
essence of Mr. Williams' complaint in this case is that his unit
social worker, Ms. Bard, was unable to communicate with him
effectively.  (Compl. at 5.)  If a finder of fact were to credit

17

the evidence in the record indicating that Mr. Williams could not communicate effectively with Ms. Bard, then it would not make sense to suggest that Mr. Williams could have employed Ms. Bard's services in order to render the Grievance Program an "available" administrative remedy.

Mr. Williams' August 24, 2006 Administrative Remedy Form, although submitted after his Complaint was filed, supports his argument regarding his inability to utilize the Grievance Program.  On the form, Mr. Williams wrote that Ms. Bard was "capable of communicationing efficiently with use of sign language [] I have to telling you that true but Ms barb have not certified of interpreter."  (Villar Aff. Ex. B 7.)  While the prison officials who received Mr. Williams' complaint form assumed that he was complaining about the fact that Ms. Bard was not a <u>certified</u> interpreter, Mr. Williams' testimony in this case is that he intended to address Ms. Bard's inability to communicate with him, but that he was not able to express this concern in writing.  (Williams Aff. ¶¶ 16-20.)  According to Mr. Williams, "[o]nly now, after discussions with [his] present court-appointed counsel, [has he] realized that what [he] wrote on the complaint form can be read to suggest that [his] problem was with Ms. Bard's lack of 'certification.'"  (<u>Id.</u> at ¶ 18.) Mr. Williams states that "[t]he main problem was Ms. Bard's inability to communicate with [him] and [his] inability to

18

understand her." (Id. at ¶ 19.)  Although the August 24, 2006
Remedy Form does not establish that Mr. Williams actually
exhausted the remedies provided by the Grievance Program before
filing his Complaint, it is evidence of his inability to
articulate his concerns in writing, which calls into question
whether the Grievance Program offered Mr. Williams an available
administrative remedy.

As was the case in Croak, Mr. Williams' "argument is not
based upon a futility rationale." Croak, 312 F.3d at 113.  Nor,
if Mr. Williams' evidence is to be believed, was Mr. Williams
merely "[a] prisoner who [did] not want to participate in the
prison grievance system." Ngo, 126 S.Ct. at 2388.  Rather, Mr.
Williams argues – and a rational jury could find – that the
restrictions his disability imposed on his ability to communicate
foreclosed the availability of the Grievance Program as an
administrative remedy. See Days, 322 F.3d at 867-68.  Because
there are triable issues of fact regarding the availability to
Mr. Williams of administrative remedies at SWSP, summary judgment
on the issue of administrative exhaustion is inappropriate at
this time.

   **C.   Access to Programs and Services**

Defendants have moved for summary judgment on the grounds
that Plaintiff was not denied access to programs and services at
SWSP on account of his disability, which, they argue, means that

19

he cannot make out a prima facie case under Title II of the ADA.
Defendants first argue that Mr. Williams was not denied access to
SWSP's behavior modification program because Ms. Bard, who taught
the behavior modification class, was a qualified interpreter who
Mr. Williams himself said was able to use sign language
"efficiently."  (Villar Aff. Ex. B at 7.)  The ADA does not
require SWSP to use certified sign language interpreters,
Defendants argue, but instead permits the use of "[q]ualified
interpreters."  28 C.F.R. § 35.104.  A "qualified interpreter,"
in turn, is defined under federal regulations implementing the
ADA as "an interpreter who is able to interpret effectively,
accurately, and impartially both receptively and expressively,
using any necessary specialized vocabulary."  Id.  Because Mr.
Williams conceded that Ms. Bard can interpret "efficiently" in
his August 24, 2006 Administrative Remedy Form, Defendants argue
that he cannot now claim that she was not a qualified
interpreter.  In Defendants' words, "Plaintiff cannot create a
question of fact by changing his own version of events."  (Def.
Reply Br. 7.)

Defendants further argue that Mr. Williams had reasonable
access to the TTY telephone system, as is evidenced by his
repeated use of the system, noting "[t]he ADA does not create a
greater right of access to a person with a disability" than is
afforded to non-disabled persons.  (Id.)  Because "Plaintiff can

20

show no set of facts to sustain a jury verdict that he was
excluded from, or denied meaningful access to, any program,
benefit or service offered at SWSP" on account of his disability,
Defendants argue that they are entitled to summary judgment.
(Id. at 8.)

Mr. Williams argues that triable issues of fact in this case
regarding the provision of interpreter and telecommunications
services at SWSP preclude the Court from granting Defendants'
motion.  With respect to SWSP's use of Ms. Bard as a sign
language interpreter, Plaintiff argues that he has never conceded
that he and Ms. Bard could communicate with each other, which
makes the adequacy of Ms. Bard's sign language interpretation a
disputed issue of material fact for the jury, rather than the
Court, to decide.  Mr. Williams argues that Defendants' reliance
on his statement in his grievance form that Ms. Bard interprets
"efficiently" is misplaced because it takes the statement out of
context.  Finally, with regard to Defendants' argument that
Plaintiff's use of the TTY system demonstrates that he was not
denied access to telecommunications services offered to non-
disabled inmates, Plaintiff argues that "Defendants' argument
misses the point . . . [because t]he fact that Mr. Williams was
able to use the system a few times in spite of defendants'
discriminatory practices does not explain away those practices."
(Pl.'s Opp'n Br. 11.)  Plaintiff argues that factual questions

21

regarding the disparity between Mr. Williams' and other inmates'
access to telephones requires that Defendants' motion be denied.

The Court will deny Defendants' motion for summary judgment
on the issue of whether Mr. Williams was denied access to
programs and services at SWSP on account of his disability.
Title II of the ADA provides:

> Subject to the provisions of this subchapter, no
> qualified individual with a disability shall, by reason
> of such disability, be excluded from participation in or
> be denied the benefits of the services, programs, or
> activities of a public entity, or be subjected to
> discrimination by any such entity.

42 U.S.C. § 12132.  The Supreme Court has recognized that
"[s]tate prisons fall squarely within the statutory definition of
'public entity.'"  Pennsylvania Dept. of Corrections v. Yeskey,
524 U.S. 206, 210 (1998).  A plaintiff alleging that a public
entity violated Title II must show that

> (1) she is a qualified individual with a disability; (2)
> she was either excluded from participation in or denied
> the benefits of a public entity's services, programs, or
> activities, or was otherwise discriminated against by the
> public entity; and (3) such exclusion, denial of
> benefits, or discrimination was by reason of her
> disability.

Calloway v. Boro of Glassboro Dept. of Police, 89 F. Supp. 2d
543, 552 (D.N.J. 2000); see also Douris v. Dougherty, 192 F.
Supp. 2d 358, 368 (E.D. Pa. 2002).

As to both the adequacy of sign language interpreting for
SWSP programs and the availability of telephone services at the
prison, there are triable issues of fact that make summary

judgment inappropriate.[7]  Federal regulations require "public entities to take appropriate steps to ensure that communication with a disabled person is as effective as communication with others."  Chisolm v. McManimon, 275 F.3d 315, 325 (3d Cir. 2001) (quoting 28 C.F.R. § 35.160(a)).  "[W]here necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity, a public entity must furnish appropriate auxiliary aids and services."  Id. (quoting 28 C.F.R. § 35.160(b)(1)).  As the Court of Appeals for the Third Circuit has noted, "[g]enerally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment."  Id. at 327-28 (citing Duffy v. Riveland, 98 F.3d 447 (9th Cir. 1996) for its holding that "the qualifications of an interpreter and the deaf inmate's ability to communicate in prison disciplinary hearing were fact questions precluding summary judgment").

The evidence in the record is plainly insufficient to support a finding that as a matter of law, Ms. Bard was "able to interpret effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabulary," as federal regulations require.  28 C.F.R. § 35.104.  Ms. Bard's own deposition testimony forecloses such a conclusion.

---

[7]  Defendants do not appear to contest that Mr. Williams is a "qualified" individual within the meaning of the ADA, and there is no dispute that SWSP is a public entity.

Ms. Bard testified that her sign language vocabulary was limited
and that she often had to resort to "finger spelling" and
communicating in writing in order to speak with hearing-impaired
inmates.  (Bard. Dep. 10, 36-37.)  Moreover, Mr. Williams
testified in his affidavit that he and Ms. Bard were unable to
communicate effectively with each other.  (Williams Aff. ¶ 19.)
A reasonable jury could certainly conclude from this evidence
that the limited nature of Ms. Bard's sign language abilities
prevented her from providing "appropriate auxiliary . . .
services."  <u>Chisolm</u>, 275 F.3d at 325.

In their motion for summary judgment, Defendants rely almost
exclusively on Plaintiff's statement in his August 24, 2006
inmate grievance form that Ms. Bard can interpret "efficiently."
(Villar Aff. Ex. B 7.)  This single statement does not resolve
the factual question before the Court as a matter of law for at
least two reasons.  First, the evidence in the record
demonstrating the difficulty written communication poses for Mr.
Williams raises doubts about exactly what he intended to
communicate in the grievance form.  Mr. Williams has testified
that he has "great difficulty with communicating, even in
writing" and "often leave[s] out important words that are
commonly used by other people when writing or speaking."
(Williams Aff. ¶¶ 21-22.)  He also testified that the message he
wanted to convey in his grievance form was that he and Ms. Bard

could <u>not</u> communicate with each other.  (<u>Id.</u> at ¶ 19.)  In light
of this evidence, Mr. Williams' single use of the word
"efficiently" does not establish the adequacy of Ms. Bard's
interpreting skills as a matter of law.

Secondly, as the Court discussed, <u>supra</u>, even if Ms. Bard's
sign language interpretation had indeed been "efficient[]," that
alone would not necessarily be sufficient to comply with Title
II's requirement that an interpreter communicate "effectively,
accurately, and impartially both receptively and expressively,
using any necessary specialized vocabulary."  28 C.F.R. § 35.104.
For example, it is not inevitably the case that an efficient
interpreter can communicate expressively or with the requisite
specialized vocabulary.  These are factual questions that are
generally not suitable to resolution on a motion for summary
judgment.  <u>Chisolm</u>, 275 F.3d at 327.  Although Mr. Williams'
statement regarding Ms. Bard's efficiency "may influence a trier
of fact's assessment of whether . . . [Ms. Bard was an] effective
auxiliary aid[], it does not show [her] effectiveness as a matter
of law."  <u>Id.</u> at 328-29.  If a jury were to find that Mr.
Williams was unable to participate meaningfully in educational
programs at SWSP because of Ms. Bard's inadequate sign language
fluency, Mr. Williams would be able to establish that he was
"excluded from participation in . . . a public entity's services,
programs, or activities . . . by reason of [his] disability" in

25

violation of Title II of the ADA.  Calloway, 89 F. Supp. 2d at
552.

The evidence is likewise insufficient to support a finding
that as a matter of law, the access to telecommunications
services that SWSP afforded to Mr. Williams complied with the
requirements of Title II.  Defendants' evidence indicates that
Mr. Williams had access to the TTY telephone system for almost
three hours per day, Monday through Friday, and that Mr. Williams
used the TTY system twelve times in a two-month period.  (Dill
Aff. Ex. A 8.)  But the question is not simply whether Mr.
Williams had access to the TTY system or was able to use it
multiple times, as Defendants' evidence shows, but whether Mr.
Williams' access to the TTY system was comparable to non-disabled
inmates' access to telephone services.  See Chisolm, 275 F.3d at
329 ("To the extent that other, non-disabled inmates had access
to communication by telephone, [the prison] was required to
provide [the plaintiff] with such access on nondiscriminatory
terms.").

Plaintiff has testified that there was no TTY system on his
tier, despite the fact that non-disabled inmates were able to use
the telephone on the tier; that he had to make special
arrangements in advance to use the TTY system, whereas non-
disabled inmates could use the telephone without such
arrangements; and that the limited periods of access to the TTY

26

system inhibited his ability to communicate with his family to a
degree that was not experienced by non-disabled inmates.
(Williams Supp. Aff. ¶¶ 11-17.)  If a jury were to credit this
testimony, it could reasonably find that Plaintiff was not
afforded access to telecommunications services "on
nondiscriminatory terms," Chisolm, 275 F.3d at 329, making the
entry of summary judgment inappropriate.[8]

Finding that there are triable questions of fact as to
whether Plaintiff was "denied the benefits of a public entity's
services . . . [or] programs . . . by reason of [his]
disability," Calloway, 89 F. Supp. 2d at 552, the Court will deny
Defendants' motion for summary judgment on the issue of whether
Plaintiff was afforded access to programs and services at SWSP on
a nondiscriminatory basis.

---

[8]  Under Title II, a public entity may be relieved of its
duty to provide equal access to disabled persons if it can
establish that the proposed action would result in a "fundamental
alteration in the nature of a service, program, or activity or in
undue financial and administrative burdens." 28 C.F.R. §
35.164.  To qualify for the 35.164 exception, "[t]he decision
that compliance would result in such alteration or burdens must
be made by the head of the public entity or his or her designee
after considering all resources available for use in the funding
and operation of the service, program, or activity and must be
accompanied by a written statement of the reasons for reaching
that conclusion." Id.  Because Defendants have offered no such
written statement, this "lone regulatory limitation" on their
duty to provide Mr. Williams comparable access to services and
programs at SWSP as is afforded to non-disabled inmates is
inapplicable to this case.  Chisolm, 275 F.3d at 325.

### D.    Individual Liability Under Title II of the ADA

The individually named defendants have moved for summary judgment on the grounds that Title II does not contemplate individual liability.[9]  According to the Individual Defendants,

───────────────

[9]  While Defendants argue that the Individual Defendants are entitled to qualified immunity, they have not raised the defense that Title II constitutes an invalid attempt to abrogate state sovereign immunity to the extent that it creates a private cause of action for damages against the state for conduct that does not violate the Fourteenth Amendment.  See United States v. Georgia, 546 U.S. 151 (2006) (holding that Title II of the ADA validly abrogates state sovereign immunity to the extent that it creates a cause of action for conduct that actually violates the Fourteenth Amendment, but leaving open the question of whether abrogation is constitutional where the conduct is not itself unconstitutional).  The Court of Appeals for the Third Circuit has held that "the party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability."  Christy v. Pennsylvania Turnpike Com'n, 54 F.3d 1140, 1144 (3d Cir. 1995).  As the court explained,

> [b]ecause Eleventh Amendment immunity can be expressly waived by a party, or forfeited through non-assertion, it does not implicate federal subject matter jurisdiction in the ordinary sense.  We agree with the Ninth Circuit that whatever its jurisdictional attributes, Eleventh Amendment immunity should be treated as an affirmative defense, and like any other such defense, that which is promised by the Eleventh Amendment must be proved by the party that asserts it and would benefit from its acceptance.  We also agree with the Ninth Circuit that considerations of fairness support this conclusion.

Id. (internal quotations and citations omitted).

In this case, the state defendants had the burden of asserting the affirmative defense of sovereign immunity, and they have not done so.  Indeed, in its June 13, 2007 Opinion, (Docket Item 33), the Court noted that Mr. Williams' Complaint raised important Eleventh Amendment questions, effectively putting the state on notice as to its potential sovereign immunity defense, and the defendants nonetheless failed to assert the defense.  In light of the fact that the state defendants had the burden of

Title II of the ADA creates a cause of action against public entities, but does not contemplate lawsuits against government employees in their individual capacities.  See Emerson v. Thiel College, 296 F.3d 184, 188 (3d Cir. 2002).  Plaintiff has not addressed the Individual Defendants' argument that Title II of the ADA does not provide for individual liability.[10]

The Court agrees with the Individual Defendants that Title II of the ADA does not provide a cause of action against government employees in their individual capacities, and will grant the Individual Defendants' motion for summary judgment as to Plaintiff's against them.  Title II prohibits public entities from discriminating against an individual based on his or her disability, and defines a "public entity" as "any state or local government, . . . any department, agency, special purpose district, or other instrumentality of a State or States or local

_____

proving their entitlement to sovereign immunity, and that "Eleventh Amendment immunity can be . . . forfeited through non-assertion," Christy, 54 F.3d at 1144, the State would appear to have waived any defense of sovereign immunity that it might have raised in this case.

[10]   The Individual Defendants also argue that even if such claims were cognizable under Title II of the ADA, they would be entitled to qualified immunity.  Because the Court agrees with the Individual Defendants that they cannot be held liable in their individual capacities, the parties' arguments regarding whether the defendants are entitled to qualified immunity are moot.  See In re Montgomery County, 215 F.3d 367, 373 (3d Cir. 2000) (noting that "the doctrine of qualified immunity protects a public official from liability for money damages in her individual capacity only") (citation omitted).

government," and public railroads.  42 U.S.C.A. § 12131(1).  On its face, the statutory definition of "public entity" does not extend to individual governmental employees.

Nearly every court that has addressed the question appears to have held that Title II does not authorize suits against government officers in their individual capacities.  See, e.g., Doe v. Division of Youth and Family Services, 148 F. Supp. 2d 462, 489 (D.N.J. 2001) ("There is no reference anywhere in Title II to individual liability for violation of the act"); Calloway v. Boro of Glassboro Dept. of Police, 89 F. Supp. 2d 543, 557 (D.N.J. 2000) (citing numerous cases for the proposition that "the weight of judicial authority supports my conclusion that individual defendants cannot be held liable for violations of Title II of the Disability Act"); Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001) ("neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials"); Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc) (finding that the term "public entity," as defined in section 12131(1), "does not include individuals"); Montez v. Romer, 32 F. Supp. 2d 1235, 1240 (D. Colo. 1999); Yeskey v. Pennsylvania, 76 F. Supp. 2d 572, 575 (M.D. Pa.

1999).[11]  While the Court of Appeals for the Third Circuit has
not squarely addressed the question of individual liability under
Title II of the ADA, it has held that there is no individual
liability under Title III, and, in so holding, noted that "this
result comports with decisions of other courts of appeals holding
that individuals are not liable under Titles I and II of the ADA,
which prohibit discrimination by employers and public entities
respectively."  Emerson, 296 F.3d at 189 (citing, inter alia,
Garcia, 280 F.3d 98 at 107).

        The Court finds this authority persuasive, and accordingly
holds that Plaintiff's claims against the Individual Defendants
are unsustainable as a matter of law.  The Individual Defendants'
motion for summary judgment will thus be granted.

        **E.   Compensatory and Punitive Damages**

        Finally, the Court addresses Defendants' motion for summary
judgment as to Plaintiff's claims for punitive and compensatory
damages.  Defendants cite Gagliardo v. Connaught Laboratories,
Inc. for the proposition that punitive damages are available
under the ADA only where "the complaining party demonstrates that
the respondent engaged in a discriminatory practice with malice
or with reckless indifference."  311 F.3d 565, 573 (3d Cir. 2003)

---

        [11]  But see Key v. Grayson, 179 F.3d 996 (6th Cir. 1999)
(holding that prison officials were entitled to qualified
immunity in lawsuit brought against them under Title II without
addressing the question of whether officers could be sued in
their individual capacities under Title II).

(citation omitted).  According to Defendants, there is no
evidence of such reckless indifference on the part of the
defendants in the record of this case – to the contrary, they
argue, Plaintiff had access to the programs and services at SWSP
through the provision of qualified interpreter services.  (Def.'s
Br. 26-27.)  Defendants similarly argue that Plaintiff is not
entitled to compensatory damages under the ADA, because in order
to recover compensatory damages under Title II, a plaintiff must
establish purposeful discrimination, which is not evident in the
record here.  (Id. at 25.)

Plaintiff argues that Defendants' motion as to both punitive
and compensatory damages should be denied.  Plaintiff argues
that, in light of his status as a sexual offender, Defendants'
failure to provide suitable access to SWSP's behavior
modification program was "egregious in the extreme."  (Pl.'s
Opp'n Br. 13.)  Plaintiff argues that Defendants' deliberate
indifference is further exhibited by Defendants' failure to make
an interpreter available to Plaintiff during certain medical
appointments, and by Defendants' explanation that it could not
afford to pay for interpreters, which Plaintiff characterizes as
a "deliberately indifferent position."  (Id.)  Finally, Plaintiff
argues that "discovery – which is now incomplete – will likely
further support Mr. Williams' compensatory and punitive damages
claims."  (Id.)

The Court will grant Defendants' motion for summary judgment as to Plaintiff's claim for punitive damages, because punitive damages are not available under Title II of the ADA as a matter of law.  The Supreme Court held in Barnes v. Gorman that "punitive damages may not be awarded in private suits brought under . . . § 202 of the ADA."  536 U.S. 181, 189 (2002).  The "reckless indifference" standard for punitive damages utilized in Gagliardo and cited by Defendants was employed in the context of Title I of the ADA and is not applicable to Mr. Williams' Title II claims.  Gagliardo, 311 F.3d at 573.

The Court will deny Defendants' motion for summary judgment as to Plaintiff's claim for compensatory damages as premature. In general, courts have held that compensatory damages are available to plaintiffs asserting claims under Title II of the ADA, but only where it is shown that the discrimination was intentional.  See, e.g., Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 126 (1st Cir. 2003) ("private individuals may recover compensatory damages under . . . Title II only for intentional discrimination"); Ferguson v. City of Phoenix, 157 F.3d 668, 674 (9th Cir. 1998) ("compensatory damages are not available under Title II . . . absent a showing of discriminatory intent").  In light of the circumscribed nature of the discovery that has occurred thus far in this case, the Court agrees with Plaintiff that it would be premature to grant Defendants' motion for

33

summary judgment as to Plaintiff's claim for compensatory damages.[12]

## IV.   CONCLUSION

For the reasons explained above, the Court will grant in part and deny in part Defendants' motion for summary judgment. Specifically, Defendants' motion for summary judgment as to Plaintiff's claims against the Individual Defendants and as to Plaintiff's claim for punitive damages will be granted, but the remainder of the relief sought in Defendants' motion will be denied.  Thus, the only claim that remains for trial is Plaintiff's § 1983 claim against the defendants in their official capacities.  The accompanying Order will be entered.

**June 17, 2008**                              **s/ Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                             United States District Judge

---

[12]  The Court notes, however, that Plaintiff's arguments regarding the extent to which the evidence demonstrates (or will demonstrate) Defendants' deliberate indifference to the risk of discrimination are not persuasive.  See Pryor v. National Collegiate Athletic Ass'n., 288 F.3d 548, 569 (3d Cir. 2002) (citing Horner v. Kentucky High School Athletic Ass'n, 206 F.3d 685, 693 n.4 (6th Cir. 2000), in holding that "the 'discriminatory animus test' involves a 'stricter standard' than the deliberate indifference test).  To prevail on his claim for compensatory damages, Plaintiff will have to present evidence of intentional discrimination, not just deliberate indifference.